IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| STEVEN DICKSON, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| THE BOSWORTH COMPANY, LTD. | § | |
| and CHARLES WITTE, | § | JURY DEMANDED |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

1. Plaintiff Steven Dickson ("Plaintiff" or "Dickson") files this Original Complaint against Defendants The Bosworth Company and Charles Witte (collectively referred to as "Defendants") and respectfully shows the Court as follows:

## PARTIES

2. Plaintiff Steven Dickson ("Dickson") is an individual citizen of the state of Texas.

3. Defendant The Bosworth Company, Ltd. ("Bosworth") is a limited partnership organized under the laws of the State of Texas. Bosworth's principal place of business is 2205 W. Industrial Avenue, Midland, Texas 79701. Its registered agent is Ron Ainsworth, and he can be served with process at 2205 W. Industrial Avenue, Midland, Texas 79701.

4. Defendant Witte ("Witte") is a citizen of the state of Texas and may be served with process wherever he may be found.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1331. This action arises under 42 U.S.C. § 1981.

6. Venue is proper in the District Court for the Western District of Texas, Midland-Odessa Division under 28 U.S.C. § 1391(b) because the unlawful employment practices were committed in Midland, Texas, and a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

**CONDITIONS PRECEDENT**

7. All conditions precedent have been performed or have occurred.

**FACTUAL BACKGROUND**

8. Dickson is an African American employee of Defendant Bosworth and works under the direction and supervision of Defendant Witte. Dickson is the only African American technician working under the supervision of Defendant Witte, and until recently was the only African American employee under the supervision of Defendant Witte.

9. From day one, Dickson had high hopes for his job with Defendants. He was told that Bosworth held strong values and rewarded employees for their hard work. As such, he accepted an entry level helper position and worked diligently to become a certified air-conditioning technician. Within only a few months, he received his own van and began making service calls as a technician.

10. Dickson's progression was remarkable, considering that most helpers work for years before becoming technicians. For a time, everything seemed to be going well. Bosworth acknowledged Dickson's exceptional performance and talent and recommended him to become one of only two certified generator technicians for Bosworth. Dickson did not let Bosworth down and completed the generator technician program at the top of his class.

11. Unfortunately, Defendants discriminated against Dickson because of his race (on one occasion Witte told employees that Dickson "just left the plantation") by denying him significant employment opportunities, including but not limited to, overlooking Dickson for

commissions, assignments of preventative maintenance appointments, ongoing trainings, promotions, and servicing generator calls. Witte denied Dickson these opportunities because, as Witte told Dickson directly, he is "allergic to black people" and "everyone has a race they don't like."

12. The rite of passage was exceptionally harder for Dickson than his non-African American co-workers. Although commissions are given to all technicians, Dickson did not begin receiving commissions once he became a technician. Dickson attempted to resolve the issue with Witte for six months, and finally had to involve other supervisors, who resolved to pay him $100 per month for lost commissions.

13. Preventative Maintenance ("PM") folders are databases created for each technician, to store their client base. PM customer service agreements are obtained by the technician and entered in the PM folders. Building a client database supplements a technician's business by giving the technician regular customers to call upon, thus a technician's client database is very valuable and is only given up when their employment terminates. When a client database is given up, the PM folder is passed down according to seniority. On more than one occasion, Witte passed over Dickson and gave PM database accounts to technicians with less seniority. When there was an available client database, and no new technicians, Witte hand selected the lucrative jobs for other technicians before having the rest assigned to Dickson. Thus, Dickson was deprived of additional income from failures to receive the PM accounts that he was passed over for.

14. Technicians also receive an appointment book, which allows scheduling to be done by the dispatch department for the technician. Dickson was not given an appointment book by Witte, even though Witte immediately gives all other technicians appointment books within weeks of their hiring. This is yet another example of unequal treatment of Dickson by Witte. Dickson's above average customer service is well known at Bosworth. That quality, along with his

determination to excel is evident in the number of PM customer service agreements obtained by Dickson. In 2019, Dickson signed over one hundred and fifty (150) customers to new PM agreements, compared to about sixty-five (65) agreements obtained by all eight (8) other technicians combined.

15. Dickson's skills and performance were noticed by other supervisors, which is how he become one of only two certified generator technicians for Bosworth. Witte did not choose Dickson for the generator program, and although Dickson completed the generator program at the top of his class, Witte assigned all generator calls to the white generator technician. In response, Dickson had to call inactive generator clients to secure new generator service agreements to create his own generator client base. Ultimately, Witte reassigned the inactive generator clients that Dickson had worked hard to reactivate to the white generator technician.

16. Like his generator client base, recently, Dickson sought to schedule PM visits for his more than one hundred and fifty (150) PM customers. To his shock, he was told that no appointments were available. In this process, Dickson discovered that Witte had reassigned many of his PM customers to other non-African American technicians. Dickson is never assigned to perform PM work for technicians who were available to service their own customers. Likewise, Dickson was always available, ready, and willing to perform the preventative maintenance service calls that Witte reassigned to other technicians.

17. Dickson immediately notified Bosworth of at least twenty-seven (27) PM service jobs Witte reassigned. Company policy states, "[Bosworth] will promptly and thoroughly investigate the facts and circumstances of any harassment claim," yet, when Bosworth was made aware of the discrimination and harassment against Dickson, it did not investigate and resolve the harassment. Instead, Bosworth dismissed Witte's actions as acceptable behavior because they occurred during the COVID-19 pandemic and at a time when Witte was mad at Dickson for social

distancing from the office, per a physician's recommendation, due to a serious medical condition Dickson has, Glucose-6-phosphate dehydrogenase deficiency (G6PDD), which could be seriously aggravated by exposure to COVID-19.

18. Witte also consistently failed to offer Dickson available trainings and classes. More than once, Witte sent all technicians, except Dickson, to training courses. When Dickson was sent to training courses by other supervisors, Witte would harass Dickson about circumventing him.

19. In February 2020, Dickson applied for a management position within the plumbing department, a position for which Dickson was eligible and qualified. Despite knowledge of Witte's harassment, Bosworth required Witte's approval before it would consider Dickson for the management position. Witte blocked Dickson from that position. Denying this advancement also denied Dickson the opportunity to acquire his plumbing license. When Dickson reported this racial bias to management, Bosworth management acknowledged the existence of racial bias within Bosworth but said that Dickson couldn't prove it. Bosworth has consistently listened to Dickson's complaints and requests, always soothing Dickson with promises of future promotions if he could just work through the racial bias a little longer. Bosworth's empty promises and statement that Dickson "can't prove" racial bias makes it clear that it was merely leading Dickson along to get him to overlook Bosworth's failure to stop racial discrimination and harassment.

20. During the beginning of the COVID-19 restrictions, Dickson requested to be dispatched to jobs from his home, per his physician's advice that he was "high risk" and should exercise extreme caution. Witte did not accept this medical opinion, and Dickson had to repeatedly defend himself from Witte, who believed COVID-19 was a hoax. Despite Dickson's request, and the opinion of Dickson's physician, Witte required all technicians to continue to gather in his office, unmasked, every morning before being dispatched to jobs. This close, unmasked situation created anxiety for Dickson that could have easily been avoided, as it was by others who took

precautions against COVID-19. Daily, Witte belittled Dickson with unsolicited medical, religious, and political opinions until Dickson spoke to Ron Ainsworth, the CEO of Bosworth, and received permission to follow his physician's advice.

21. Routinely, Witte contacted off-duty technicians to back-up or help whoever was on call, in advance of potentially busy weekends. However, when Dickson was on call, Witte did not plan help for him and refused to get him help—even when Dickson asked for help on days of record-breaking calls, over fifty calls per day. The only assistance Witte ever gave Dickson was to tell him to call other technicians for help, something Witte does himself for other technicians. Similarly, Witte regularly refuses to answer and delays responding to Dickson's calls. Yet, if Dickson asks another technician to call, Witte is somehow always available to answer and return their calls.

22. The empathy and courtesies displayed by Witte to other technicians was not present for Dickson. When Dickson texted Witte that his mother-in-law had passed and that he would be taking time off, Witte questioned the need for time off and offered only inappropriate quips that it was "funny" and "strange," instead of offering condolences. On one occasion, Dickson had two flat tires while servicing calls near Witte's house. When Dickson called Witte for help, Witte curtly told him to change the tires and get his calls done. Ironically, two days later, on Dickson's day off, Dickson received a call from the on-call technician requesting help. Although not on call, Dickson agreed that after he completed his errands that he would cover one of the only three calls the technician had for the day. Within thirty minutes, Witte called Dickson to question him as to his whereabouts and why he had yet to cover the call. When Dickson told Witte that he was completing his errands, Witte yelled at Dickson, "I don't care what you're doing, get in your van and get to work now." This unwarranted, abrasive treatment is par for course for Dickson. Witte has made numerous racially charged comments to Dickson, including that Dickson was "just off the

plantation," Witte is "allergic to black people," and "everyone has a race they don't like." Despite every incident being reported to management, Bosworth refuses to take corrective action.

23. Witte has harassed, retaliated against and discriminated against Dickson for years. His confessed feelings that "everyone has a race they don't like," along with otherwise unexplainable, unequal management practices, confirms Dickson's claims. Witte has benefitted from his skills and work ethic but refused to allow Dickson the same benefits and fair work environment his fellow, non-African American technicians have.

## CLAIMS FOR RELIEF

## COUNT 1 – Violation of 42 U.S.C. § 1981 by Defendants

24. Dickson hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

25. Dickson is an employee within the meaning of 42 U.S.C. § 1981 and belongs to a class protected under the statute, namely he is an African American.

26. Witte exercised control over Dickson with respect to employment decisions and his acts were those of Bosworth in exercising this authority. Specifically, Witte was empowered by Bosworth to take tangible employment actions against Dickson.

27. Defendants intentionally discriminated against Dickson because of his race in violation of 42 U.S.C. § 1981, by treating him differently because of the color of his skin. Specifically, Defendants took away from and prevented Dickson from obtaining job assignments that directly reduced his pay. Defendants denied Dickson trainings and promotions made available to employees who were not African American, and Defendants reduced compensation to Dickson because of his race.

## ATTORNEYS' FEES AND COSTS

28. As a result of Defendants' conduct, Dickson retained the undersigned counsel to prosecute his claims. Dickson seeks to recover his attorneys' fees and any expert witness fees and any costs incurred from bringing this action as authorized by statute.

## PRAYER

29. For these reasons, Dickson respectfully prays that Defendants be cited to appear and answer, and that on final hearing, the Court enter judgment against Defendants for the following costs, fees, and damages:

    a. Lost wages, including back pay, front pay, and compensatory damages;

    b. punitive damages;

    c. costs of this action;

    d. pre-judgment and post-judgment interest at the maximum rate allowed by law;

    e. attorneys' fees; and

    f. such other and further relief as the Court deems just and proper.

Respectfully submitted,

By: */s/ Fernando M. Bustos*
Fernando M. Bustos; SBN: 24001819
fbustos@bustoslawfirm.com
Matthew N. Zimmerman; SBN: 24100386
mzimmerman@bustoslawfirm.com
BUSTOS LAW FIRM, P.C.
P.O. Box 1980
Lubbock, Texas 79408-1980
(806) 780-3976
(806) 780-3800 FAX
ATTORNEYS FOR PLAINTIFF