IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| STEVEN DICKSON,<br>    *Plaintiff*, | §<br>§<br>§ | |
| v. | § | No. MO:21-CV-009-DC |
| | § | |
| BOSWORTH COMPANY, LTD., and<br>CHARLES WITTE,<br>    *Defendants*. | §<br>§<br>§<br>§ | |

### ORDER

BEFORE THE COURT is Defendants The Bosworth Company, Ltd. ("Bosworth") and Charles Witte's ("Witte") (collectively, "Defendants") Motion for Summary Judgment (Doc. 29), Plaintiff Steven Dickson's ("Dickson") Response (Doc. 33), and Defendants' Reply (Doc. 38). Having considered the parties' submissions, the record, and the applicable law, the Court **GRANTS** Defendants' Motion. (Doc. 29).

### I.   BACKGROUND

This case concerns discrimination that Dickson faced while employed by Bosworth and managed by Witte. (Doc. 1). Witte is the Service Manager for heating, ventilation, and air-conditioning ("HVAC") at Bosworth, a plumbing, heating, and air-conditioning company in Midland, Texas. (Doc. 29-1 at 73; Ainsworth[1] Depo., 23:5-7). Witte supervises eight HVAC technicians and helpers. (*Id*. at 89; Witte Depo., 20:24-21:2). Witte was Dickson's direct supervisor during his employment with Bosworth. (*Id*. at 90; Witte Depo., 22:15-17). Witte has hired several black employees including Dickson and Reggie Matthews, another HVAC technician. (*Id*. at 174; Dickson Depo., 131:17-22); (*Id*. at 151; Dickson Depo., 39:16-22); (Doc. 33-1 at 34; Dickson Depo, 129:23–131:22).

---

[1] Ron Ainsworth ("Ainsworth") is the Chief Executive Officer ("CEO") of Bosworth.

Dickson was hired to work at Bosworth in December 2017. (Doc. 29-1 at 151; Dickson Depo., 39:16-22). Dickson received pay raises while working for Bosworth, many of which were approved by Witte. (*Id*.; Dickson Depo., 40:9-15). When Dickson complained to management about his compensation, they approved Dickson's raises. (Doc. 36-5 at 2–3). Dickson and a white technician ("J.O.") were the only two technicians certified to work on generators. (Doc. 29-1 at 99; Witte Depo., 59:15-18). J.O. made more money than Dickson in 2020; however, there was approximately a one-month period that Dickson did not work due to COVID. (*Id*. at 166–67; Dickson Depo., 99:24–101:3). Technicians are paid on an hourly basis and earn commissions according to a formula based on equipment sales, flat rate, and contract sales, parts, and preventative maintenance signups. (*Id*. at 129–31; Rodriguez[2] Depo., 76:22–88:12).

In November of 2018, Witte sneezed while Dickson was next to him and made a comment that he was allergic to black people. (*Id*. at 150; Dickson Depo., 35:4-12); (*Id*. at 113; Rodriguez Depo., 10:19–11:2). The comment was made during a morning meeting with approximately five to seven people present. (*Id*. at 150; Dickson Depo., 35:13–36:1). Dickson was the only black person present. (*Id*.; Dickson Depo., 36:2-4). Dickson was offended by the comment and walked out of the meeting. (*Id*.; Dickson Depo., 36:5-9). Dickson complained to Field Supervision Manager Wayne Beaird ("Beaird") and Operations Manager Rodriguez about the comment, and Beaird told Dickson that he would take care of it. (*Id*. at 151; Dickson Depo., 38:15-23). Beaird and Rodriguez work closely together. (*Id*. at 113; Rodriguez Depo., 11:14-25).

Rodriguez confronted Witte about the remark, and Witte admitted he said it. (*Id*.; Rodriguez Depo., 10:05-18). Rodriguez told him it was not appropriate to make that kind of

---

[2] Ruben Rodriguez ("Rodriguez") was an Operations Manager at Bosworth during the relevant time.

remark in the workplace. (*Id*.). This was a verbal warning. (*Id*.; Rodriguez Depo., 12:10-17). The next day, Witte apologized for the comment. (*Id*. at 114; Rodriguez Depo., 13:2-12); (*Id*. at 98; Witte Depo., 54:5-9). Dickson recorded the meeting. (*Id*. at 150; Dickson Depo., 36:17-19). Dickson also complains about the following conversation that allegedly occurred in 2021:

> he just made the comment to me as – and I can't remember exactly what the conversation entailed and where he came off and got this but he was – he just asked me like, "As if you were off of a plantation," just out of nowhere, which that was the last comment that he made. . . . I'm not ex--- you, know, the words may not fall in the category the way he said it 100 percent, but it was along the lines as if I'd just got off the plantation.

(Doc. 33-1 at 12; Dickson Depo., 41:1-14).

In 2018, Dickson raised the issue with Witte that he was not receiving commissions and Bosworth paid him $500.00 to make up for the three to five months that he did not receive commissions. (Doc. 29-1 at 161; Dickson Depo., 79:19–80:9). At the time, Dickson had no feeling that it was based on race. (*Id*. at 163; Dickson Depo., 86:2-7). Commission calculations are done by Operations Manager Rodriguez and inputted into the system by Human Resources ("HR") Manager Anna Stull. (*Id*. at 72; Ainsworth Depo., 18:14-18).

Dickson complained to Witte that he was not assigned backup when he was on call and Witte corrected the problem. (*Id*. at 164–165; Dickson Depo., 92:16–93:5; 94:2-4). In a recording with Rodriguez, Dickson complained Witte took 27 of his customers out of his HVAC preventative maintenance ("PM") list and given them to other technicians. (*Id*. at 153; Dickson Depo., 48:14-21). Rodriguez asked for the list of 27 customers and Dickson did not give it to him. (*Id*. at 155; Dickson Depo., 55:11-15); (*Id*. at 115; Rodriguez Depo., 17:10-20). Dickson did not keep any kind of record identifying those 27 customers. (*Id*. at 126; Dickson Depo., 64:16-19).

Rodriguez investigated the complaint by asking Witte how he was handling PMs and if he was reassigning them. (*Id*. at 115; Rodriguez Depo., 18:14–19:8). Witte told Rodriguez that the dispatcher was handling them, and Witte had instructed the dispatcher to assign them so that everyone had the opportunity to work at least eight (8) hours per day. (*Id*.; Rodriguez Depo., 19:9–20:7). Even if another technician serviced a particular customer in the system, the customer would still be assigned as Dickson's PM. (*Id*. at 119; Rodriguez Depo., 34:19-22). If Witte were to instruct dispatch to move PMs, dispatch would not do it without Rodriguez's consent. (*Id*. at 117; Rodriguez Depo., 27:15-17). Bosworth has approximately 12,000 PMs. (*Id*. at 119; Rodriguez Depo., 36:9-11).

Dickson complained to CEO Ainsworth about possible COVID exposure, and Ainsworth told him he could go home and take the time off that he needed. (*Id*. at 167; Dickson Depo., 101:2–102:1). Ainsworth made Dickson feel comfortable talking about these issues. (*Id*.; Dickson Depo., 103:15-23). After Dickson failed a first drug test, Dickson claims he was not written-up, and did not receive a verbal warning. (Doc. 33-1, Dickson Depo., 27:3–28:14). Dickson's employment was terminated after he failed a second drug test. (Doc. 29-1 at 149; Dickson Depo., 30:14-24). Dickson claims he was not given the opportunity to take corrective action. Bosworth policy allows for an employee to be terminated after failing one test. (*Id*. at 78; Ainsworth Depo., 42:18–43:4).

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Further, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id*. After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III.   DISCUSSION

Defendants seek summary judgment on Dickson's hostile work environment, disparate treatment, and retaliation claims. Dickson brings his race discrimination claims against Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981. The United States Court of Appeals for the Fifth Circuit has consistently held that "race discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n. 7 (5th Cir. 2004); *see also Jones v. Robinson Prop. Group*, 427 F.3d 987, 992 (5th Cir. 2005) ("[T]he analysis under both [Title VII and § 1981] [is] identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies."). Because the same analysis applies, the Court will consider these claims together under the Title VII evidentiary framework.

**A.     Disparate Treatment**

Dickson claims he was the subject of disparate treatment based on his race, arguing that (i) he applied for and would have been granted a plumbing supervisor position but for Witte's disapproval; (ii) Defendants refused to adequately train Dickson which affected his compensation and Defendants treated similarly situated employees more favorably than Dickson; (iii) Defendants reduced Dickson's pay by taking away and refusing to give Dickson work from the PM agreements; (iv) Defendants refused Dickson's compensation because of his race; and (v) Defendants did not terminate other employees despite failed drug results. (Doc. 33). Because Dickson attempts to prove race-based discrimination under Title VII through circumstantial evidence, the Court must evaluate his claims under the burden-shifting framework

set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Fifth Circuit. *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015).

"Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007). To establish his prima facie case, Dickson must show that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)).

### 1.   Plumbing Supervisor Position

Defendants are entitled to summary judgment on Dickson's claim for failure to promote to the plumbing supervisor position because Dickson does not have a plumbing license and no position was available. Dickson claims he was blocked by Witte from a management position in the Plumbing Department of Bosworth. The prima facie elements of a failure to promote claim are (1) the plaintiff belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside the

protected class was hired for the position. *Jenkins v. La. Workforce Comm'n*, 713 F. App'x 242, 244–45 (5th Cir. 2017).

Defendants do not dispute the first element of Dickson's prima facie case: he is a member of a protected class. Defendants contend Dickson has presented no evidence as to the second and fourth elements of the prima facie case with respect to the position of plumbing supervisor. The second element of the prima facie case is that Plaintiff was qualified for a position for which applicants were being sought. *Jenkins*, 713 F. App'x at 244–45. The fourth element is that a person outside the protected class was hired for the position. *Id.*

First, Dickson cannot establish he applied for and was qualified for a position for which applicants were sought. It is undisputed that Dickson does not have a plumbing license. Thus, Dickson was not qualified for the position of Plumbing Supervisor. Second, Dickson cannot establish that a person outside the protected class was hired for the position. The position at issue was never created, and therefore, cannot be eliminated.

According to Field Supervision Manager Wayne Beaird, there was a time when Bosworth considered adding a plumbing manager to oversee reverse osmosis ("RO") services. (Doc. 29-1 at 10 ¶ 3). Ultimately, Bosworth decided not to create the position. (*Id.* ¶ 7). Even if it had been created, Dickson would not qualify because he did not have a plumbing license. (*Id.*). All Bosworth plumbing supervisors are licensed plumbers. (*Id.* ¶ 3).

Dickson's text messages with Matt Sanchez, the nephew of Dickson's wife, do not change this result. (Doc. 33-1 at 6; Dickson Depo., 15:13-14). The text messages do not show any discriminatory motive on Witte's part. To the contrary, they show it is unusual for employees to change departments at Bosworth. Because Dickson's allegations are not grounded in specific facts sufficient to create a genuine dispute of material fact, the Court finds there is

insufficient evidence to sustain a failure-to-promote claim. Thus, the Court **GRANTS** summary judgment on this disparate treatment claim.

### 2. Failure to Provide Training

Next, Dickson claims he was blocked by Witte from receiving trainings. In *Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 397 (5th Cir. 2016), the plaintiffs alleged race discrimination based on lack of training relative to similarly situated employees of a different race, which purportedly affected their compensation by decreasing the opportunity to earn overtime. The Court granted summary judgment on the basis that such evidence "only shows a potential, tangential effect on increased compensation." 640 F. App'x at 397. The Fifth Circuit explained, "Plaintiffs state in a conclusory fashion that employment records and summary charts show that non-African-American employees received greater training than Plaintiffs, leading to better overtime and employment opportunities." *Id*. at 398.

In this case, Dickson admitted he was allowed to attend and participate in trainings. (Doc. 29-1 at 161, Dickson Depo., 79:2-5). For example, Dickson received generator training and three certifications. (*Id*. at Dickson Depo., 78:1–79:1). Dickson cannot create a fact issue by submitting a declaration that contradicts his previous testimony. *Albertson v. T.J. Stevenson & Co., Inc*., 749 F.2d 223, 228 (5th Cir. 1984). Because Dickson's allegations are not grounded in specific facts sufficient to create a genuine dispute of material fact, the Court **GRANTS** summary judgment on this disparate treatment claim.

### 3. PM Agreements

Defendants are entitled to summary judgment on Dickson's claim that Defendants took away from and prevented him from obtaining job assignments that directly reduced his pay. This claim relates to "PMs," or preventative maintenance agreements, which is a marketing tool that

9

Bosworth uses to maintain contact with customers.  (Doc. 29-1 at 156, Dickson Depo., 60: 21-61:9).  When a technician provides services to a customer, he asks the customer if the customer would like to sign up for twice annual calls to schedule preventive maintenance.  (*Id*. at 157; Dickson Depo., 61:10-17).  The customer has no obligation to schedule the service, and Bosworth only bills the service if it is provided.  (*Id*.; Dickson Depo., 61:18–62:10).  Dickson complained to Operations Manager Rodriguez that Witte had reassigned 27 customers, but Dickson did not give the names to Rodriguez to investigate.  (*Id*. at 155; Dickson Depo., 55:11-15).  Dickson has never identified those 27 customers.  (*Id*.; Dickson Depo., 56:3-5).

Regardless, the Fifth Circuit has explained that removing a major account is not an adverse employment action.  *Walker v. Thompson,* 214 F.3d 615, 626–28 (5th Cir. 2000), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  An adverse employment action is an ultimate employment decision "such as hiring, granting leave, discharging, promoting, or compensating." *Pegram v. Honeywell, Inc*., 361 F.3d 272, 282 (5th Cir. 2004). Because Dickson's allegations are not grounded in specific facts sufficient to create a genuine dispute of material fact, the Court **GRANTS** summary judgment on this disparate treatment claim.

    **4.**    **Reduced Compensation Due to Race**

Dickson has failed to show that he was paid less than a comparator of a different race.  Although Bosworth failed to pay commissions for three to five months after Dickson was promoted to technician, Bosworth paid makeup commissions, and Dickson accepted them.  (Doc. 29-1 at 161; Dickson Depo., 79:19–80:2).  Dickson was paid within $300 of his comparator in the years 2018 and 2019.  In 2020, during the pandemic, Dickson made less than J.O. because he worked 604.5 ewer hours due to Dickson's choice not to work because of health concerns.  (Doc.

33-1 at 27; Dickson Depo., 99:24–100:7). Because Dickson's allegations are not grounded in specific facts sufficient to create a genuine dispute of material fact, the Court **GRANTS** summary judgment on this disparate treatment claim.

### 5. Failed Drug Tests

Dickson refused a pre-employment drug test and failed two drug tests during his employment, resulting in his termination. (Doc. 38 at 10). Dickson has failed to show that a similarly situated employee was treated more favorably under nearly identical circumstances. *Okoye*, 245 F.3d at 514. The fourth element requires the plaintiff to show that the employer treated similarly situated employees more favorably under "nearly identical circumstances." *Id*. "Nearly identical circumstances" means that the comparator "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. *Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 2160 (5th Cir. 2009).

- Participant 14 failed three alcohol tests. He is not similarly situated to Plaintiff because alcohol is not an illegal substance.

- Participant 1099 failed one drug test. The second entry on the next day is a confirmation test. He was treated less favorably than Plaintiff because he was terminated based on this test.

- Participant 1333 shows to have failed a pre-employment test and was given a second chance, just as Dickson was given a second chance when he refused a pre-employment test. Participant 1333 failed one test during his employment. Dickson failed two tests during his employment.

- Participant 1356 tested positive twice and was terminated. Participant 1565 has two entries on the same day. In the status column, further testing is required. The next entry shows he failed one test.

Dickson cannot identify a comparator who was treated more favorably. He was treated in the same manner as Participant 1356, who failed two tests, is not in the protected class, and was

11

also terminated.  The Court **GRANTS** summary judgment on this disparate treatment claim because Dickson cannot produce sufficient evidence that would permit a reasonable fact finder to conclude that he and other employees are similarly situated.

## B.     Retaliation

Defendants also move for summary judgment on Dickson's retaliation claims.  Title VII's anti-retaliation provision prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).  To state a claim for retaliation, Dickson must meet the initial burden of showing that: (1) he engaged in a protected activity pursuant to one of the statutes, (2) an adverse employment action occurred, and (3) there exists a causal link connecting the protected activity to the adverse employment action. *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 618 (5th Cir. 2020).

An employee engages in a protected activity by (1) opposing an employment practice made unlawful by Title VII, or (2) by making a charge or testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII.  *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)).  The underlying practice need not actually be illegal, but the employee must at least reasonably believe that it is.  *See id.*  Once the plaintiff meets his initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If the employer proffers a legitimate, nondiscriminatory reason, the burden then returns to the plaintiff to prove that the employer's reason is pretext for unlawful discrimination. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005).

12

Defendants concede that Dickson engaged in protected activity and that he suffered an adverse employment action when he was terminated. However, Dickson cannot establish a causal connection between the protected activity and the termination. Dickson's complaint about Witte occurred nearly three (3) years before his termination. There is simply no evidence to suggest that the termination was related to the protected activity.

Even if Dickson could establish the prima facie elements of his termination claim, the burden shifts to Defendants to articulate a legitimate nondiscriminatory reason for the termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993). Defendants terminated Dickson because he had two positive random drug tests. While Defendant Bosworth's policy states that failing a drug test may be grounds for immediate dismissal, Bosworth has typically allowed an employee a second chance: "It's not a three strike at bat. It's two." (Doc. 29-1 at 78, Ainsworth Depo., 42:18–43:4). Dickson has failed to show that the reason given for his termination is a pretext for discrimination.

Notably, Witte hired Dickson. Dickson's retaliation claim is substantially undermined by the fact that Witte did not terminate Dickson's employment after the first time Dickson failed a drug test. There is no evidence that Witte discriminated against Dickson based on his race by terminating his employment when Witte hired Dickson and accepted Dickson's explanation for failing the first drug test. Dickson cannot show but-for causation between his protected activity and any materially adverse employment action.

Plaintiff has failed to raise a genuine issue of material fact as to whether the reason given by Defendants for his termination is a pretext for discrimination. No other Bosworth employee between 2016 and 2020 failed more than two drug tests and remained employed. Accordingly, the Court **GRANTS** summary judgment on Dickson's retaliation claim.

C.   **Hostile Work Environment**

Defendants move for summary judgment on Dickson's hostile work environment claims. To establish his hostile work environment claim, Dickson must prove five elements:

> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment" in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *Id.* at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

Dickson identifies four remarks that he contends are race-related. First, the "allergic to black people" comment in 2018. Second, the "off the plantation" comment in 2021. Third, the statement that "everyone has a race that they don't like." As to the third comment, it was not directed at Dickson who admitted he did not take Witte to be referring to his race when he made the comment:

> Q.   When you heard that, did you take him to be referring to your race, that he did not like your race?
>
> A.   Not really. I really didn't feel that way.

14

(Doc. 29-1 at 175, Dickson Depo., 134:10-13).  Fourth, Rodriguez's remark about what is in people's hearts.

Defendants agree that Dickson belongs to a protected class, that he was subjected to what he considered to be unwelcome harassment, and that the comments were based on race. However, Defendants argue Dickson fails to establish a prima facie case on the fourth element because these comments were isolated over a three-year period and were not severe or pervasive enough to alter the terms and conditions of Dickson's employment.  Further, Defendants contend Dickson cannot carry his burden on the fifth element because he cannot show that Bosworth knew or should have known about the harassment and failed to take prompt remedial action.

After Dickson reported the "allergic to black people" joke, Bosworth's Operations Manager Rodriguez confronted Witte and told him that was not appropriate for the workplace. While this offhand joke is troubling, Bosworth's response to the report of racist language is sufficient to shield it from potentially liability—at least without additional evidence of inadequacy of the response or sufficient evidence of additional reports to management that went without any response.  Bosworth took sufficiently prompt remedial action when Rodriguez questioned Witte and orally reprimanded him.  *See Williams-Boldware v. Denton Cty., Tex.,* 741 F.3d 635, 640 (5th Cir. 2014) ("A defendant may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant").

Dickson did not report the "plantation" comment to any manager at Bosworth.  (Doc. 29-1 at 152; Dickson Depo., 43:17–44:1).  The single remark does not arise to the level of a hostile work environment, particularly where it is not reported to management.  *Brooks*, 640 F. App'x at 399.  Bosworth had no knowledge of any harassment after Dickson reported the "allergic to black people" comment and Bosworth took corrective action.  Therefore, Bosworth cannot be

liable for any subsequent harassment. Dickson cannot rely on a single complaint to Bosworth to shield himself from his obligation to report continuing harassment. *Sims v. Equilon Pipeline, Inc.*, CIV.A. SA-01-CA-0875, 2004 WL 557314, at *14 (W.D. Tex. Feb. 3, 2004).

Although there is no numerical threshold for racist comments that a plaintiff must meet to demonstrate a hostile environment, the "mere utterance of an . . . epithet which engenders offensive feelings" is insufficient. *Johnson v. TCB Const. Co., Inc.*, 334 Fed. App'x 666, 670 (5th Cir. 2009); *Grant v. UOP, Inc.*, 972 F. Supp. 1042, 1047 (W.D. La. 1996), *aff'd*, 122 F.3d 1066 (5th Cir. 1997) (finding five separate utterances of the n-word directly to the plaintiff insufficient to establish hostile work environment); *Anderson v. Sikorsky Support Services, Inc.*, 66 F. Supp. 3d 863, 874 (S.D. Tex. 2014) (finding no hostile work environment when plaintiff was called the n-word once, overheard a supervisor use say the n-word to another supervisor, found a note that included the n-word, and witnessed coworkers drag a noose behind their golf cart). Under the law of this Circuit, more is required to sustain a claim for hostile work environment.

Viewing the evidence in the light most favorable to the nonmovant, while the Court acknowledges that such remarks are inappropriate, they are also isolated incidents that do not involve physical threats and do not interfere with Dickson's work. *Id.* at 400. A single utterance may be sufficient to support a hostile work environment but in this case the remarks are too remote in time and do not rise to the level of severity or pervasiveness to alter the terms and conditions of Dickson's employment. Accordingly, the Court **GRANTS** summary judgment on Dickson's hostile work environment claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 29) as to all of Dickson's claims against Defendants.

It is so **ORDERED**.

SIGNED this 1st day of August, 2022.

*/s/ David Counts*

DAVID COUNTS
UNITED STATES DISTRICT JUDGE